NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0772n.06
Filed: December 19, 2008

**07-4234**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

TIMOTHY B. LEDFORD,                )
                                   )
    Plaintiff-Appellant,           )
                                   )
v.                                 )   ON APPEAL FROM THE UNITED
                                   )   STATES DISTRICT COURT FOR THE
MICHAEL J. ASTRUE. COMMISSIONER    )   SOUTHERN DISTRICT OF OHIO
OF SOCIAL SECURITY,                )
                                   )
    Defendant-Appellee.            )

Before: DAUGHTREY and GILMAN, Circuit Judges; MILLS,[*] District Judge.

**PER CURIAM.** The plaintiff, Timothy Ledford, appeals the decision of the Commissioner of Social Security that denied him disability benefits, alleging constitutional, administrative, and evidentiary errors. He claims that the administrative law judge's failure to reopen a benefits-cessation decision violated his right to due process, that continued cessation of previously-awarded benefits was improper, and that his new application for benefits was improperly denied. We find no reason to disturb the district court's determination that Ledford is able to perform "light work" jobs within the regional and

---

[*]The Hon. Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

national economy and, thus, we affirm the judgment denying Ledford Social Security disability benefits.

### FACTUAL AND PROCEDURAL BACKGROUND

At the time of the 2005 evidentiary hearing in this matter, Timothy Ledford was a 32-year-old high school graduate who had not been gainfully employed in the previous ten years and had not been employed at all since May 1, 1997. Prior to 1995, he had held a number of jobs, including employment stints as a packer at an automobile parts manufacturing plant, a farm worker, a detailer at an automobile dealer's lot (referred to in the record as a "lot technician"), and a pizza deliverer. While working at his last job as a packer, however, he suffered a nervous breakdown and, as of May 11, 1995, qualified for Social Security disability benefits due to his mental and emotional conditions.

In 1999, the plaintiff was convicted of a felony sexual assault upon a minor and was sentenced to incarceration within the Ohio state correctional system. Ledford continued to receive his disability payments, however, until February 2001, at which time the benefits ceased because the Social Security Administration failed to receive evidence from the plaintiff documenting his continued disability. Following his release from confinement, Ledford filed a second application for disability benefits on January 30, 2002. In that application, the plaintiff asserted that he became unable to work on March 1, 2001, as a result of the following "illnesses, injuries or conditions":

> Learning disability – mental illness – depression – cannot read very much – right shoulder injury – difficulty getting along with other people – inappropriate behavior – difficulty following instructions – cannot read enough to understand.

In light of Ledford's employment history, the Social Security Administration concluded that the plaintiff satisfied the insured status requirements of the governing federal legislation only through September 30, 2002, and that Ledford was thus required to prove that he was disabled on or before that date. After examining the documentary evidence provided by the plaintiff, the administrative agency denied the request for benefits, both initially and upon request for reconsideration. Ledford then sought an evidentiary hearing before an administrative law judge and such a proceeding was conducted on March 16, 2005.

At the hearing, the plaintiff testified that he lived with his parents and remained unemployed. He further said that he had been placed in special education classes throughout school and that, although he graduated from high school in 1992, he could read at approximately a first-grade level, had trouble writing, could do only basic math, subtraction, and simple multiplication. He also claimed that, prior to September 2002, he experienced problems with his right shoulder as a result of being attacked in prison in 1999 by 11 other inmates. During the relevant period of insurability, he also suffered from depression, "g[o]t agitated a lot," and had difficulty sleeping. Ledford explained that his emotional problems improved with the medication Zoloft but that he could not afford to pay for a steady supply of the drug. Because he had neither a job nor friends, he said, he

would spend his days making different figures from broken toys, playing video games, running errands for his parents, seeing an occasional movie, helping with the cleaning of the family bathroom, and watching television. Ledford also was able to dress himself, drive a car, cook simple meals, and assist with laundry, cleaning his room, and taking out the garbage. He further testified that the difficulties he then experienced with mood swings, low self-esteem, and concentration were "about the same" as they were in September 2002.

The plaintiff's father, Paul Ledford, also testified before the administrative law judge. He corroborated much of his son's testimony and volunteered that Timothy "has a real short fuse" that prevents his return to a job.

The final witness at the hearing was George Parsons, a vocational expert. After Parsons expressed his opinion that each job that the plaintiff had during his brief employment history could be classified as light work and unskilled work, the administrative law judge posed the following hypothetical question to the witness:

> Dr. Parsons, if you assume, please, an individual the same age as Claimant as of September 2002 and the same education and work experience as of that date with the following limitations – and where the terms that I'm using are terms that are defined in the Dictionary of Occupational Titles, I'm using them to have the same meanings as in the DOT. The individual can lift, carry, push and pull without limit except as to the right upper extremity which is limited to no more than 30 pounds. The individual cannot climb ladders, ropes, or scaffolds. The individual can perform only simple, routine tasks; is able to understand, remember, and carry out only short and simple instructions; cannot interact with the general public or interact more than occasionally with co-workers or supervisors. The individual was able to

make only simple work-related decisions. The job should not require reading or writing skills above a second-grade level or math skills above a fourth-grade level. Could such an individual perform any of the Claimant's past-relevant work, either as he performed it or if different, as customarily performed in the national economy?

The witness responded:

Your Honor, it would be my professional opinion that he could continue to work in the same or similar type of work activity that he did in the past. Certainly the job as a packer and lot tech would certainly fit. I'm not sure about pizza delivery since [it] would put him in contact with the general public.

Additionally, Parsons testified that the hypothetical claimant could also perform other jobs in the economy consistent with the limitations imposed. Specifically, the vocational expert identified the occupations of "non-farm animal care taking, ground maintenance or lawn care, and work as a dishwasher." Finally, although Parsons did not provide the administrative law judge with the number of lot technician and packing jobs available in the local and national economies, he did offer that the animal care, ground maintenance, and dishwasher occupations, limited to light work, constituted a total of 1,047 jobs locally and 180,000 jobs nationally.

The administrative law judge considered the testimony offered by each of the three witnesses at the hearing, as well as the documentary medical evidence submitted by the

parties.[1]   Included in that evidence were the following summarized reports and other information:

*June 1998 court testimony of Jolie Brams, a clinical psychologist*:

In the testimony offered at the plaintiff's criminal trial on the sexual assault charge, Brams described Ledford as severely learning-disabled with severe limitations in the activities of daily living.  She noted his intellectual limitations, his depression, and a possible schizo-affective disorder.  Despite that dire diagnosis and the plaintiff's difficulties in judgment and reasoning, his social fears, and his delusions, she claimed that Ledford could still perform low-stress, repetitive work and basic tasks that did not call for independent judgment, abstract reasoning, or understanding.

*Prison medical reports from the period between 1999 and January 2002*:

Numerous reports of examinations of the plaintiff during his prison sentence highlighted his initial depression and the efforts to treat that condition with Zoloft, an antidepressant.  Although Ledford was given 150 milligrams of the medication daily in May 1999, records indicated that by 2001, the psychiatrists in charge of his care had reduced

---

[1]The medical evidence submitted to the administrative law judge clearly indicated that Ledford consistently complained of pain, tenderness, and a reduced range of motion in his right shoulder. Nevertheless, the documentary evidence pointed to a diagnosis of tendinitis of the joint that would not significantly inhibit the plaintiff from engaging in sedentary, light-to-moderate work tempered with a 30-pound weight limitation.  Because Ledford does not assert on appeal that he is entitled to disability benefits because of his shoulder injury, additional references to evidence concerning the shoulder pain will be omitted from this discussion.

the dosage to 50 milligrams per day.  Moreover, even at that reduced dosage, the medication seemed to be serving its intended purpose as progress reports one month and less than one week prior to his discharge from prison described the plaintiff as either no longer depressed  or as "a little bit subdued, although not particularly depressed."

*March 11, 2002, report of psychologist Dale Seifert:*

During his interview and testing with Seifert, Ledford exhibited trouble in organizing his thoughts and slowness in processing information.  Seifert diagnosed the plaintiff with general anxiety disorder and borderline intellectual functioning.  He further noted Ledford's "moderate limitations" in his ability to relate to others, his ability to understand and follow instructions, his ability to maintain the attention necessary to perform simple, repetitive tasks, and his ability to "withstand the stress and pressures associated with day-to-day work activity because of his high level of anxiety."

*February, March, and August 2002 reports of psychologist Roy Ford*:

In his reports, Ford noted the plaintiff's below-average intelligence and mild mental retardation.  He also referred to the outbursts of anger that Ledford sometimes exhibited and surmised that stress contributes to the deterioration of the plaintiff's mood. Nevertheless, Ford uncovered no evidence of thought disorders and found Ledford oriented to time and place.  Despite the plaintiff's poor social interaction history, Ford

offered his opinion that Ledford could follow simple directions, although pressure in the workplace could be a problem for him.

*March 26, 2002, report of psychologist Joanne Kadle*:

Kadle performed a capacity assessment of the plaintiff and concluded that Ledford was "moderately limited" in his ability to maintain his concentration and in his general ability to interact appropriately with the public and with co-workers. She determined, however, that he could still perform "single and multistep tasks of a routine nature requiring no more than casual social interactions."

Even though the parties agreed that the plaintiff continued on insured status for Social Security purposes only through September 30, 2002, evidence from evaluations of Ledford after that date were also presented to the administrative law judge. Included in those documents were notes from a May 2004 visit to a physician who mentioned the plaintiff's history of depression but described Ledford at the visit as "pleasant and cooperative." By June 11, 2004, the notes from that same clinic indicated that the plaintiff's mental state "is improved even though he has been on the Zoloft for only a few weeks" after his lapsed prescription was refilled.

Psychiatrist H. Schulte also examined Ledford in June 2004. In his notes of that session, Schulte chronicled the plaintiff's history of depression, anxiety, and mood swings. Although he observed that Ledford was "cooperative and ha[d] a normal affect," he also

discussed the plaintiff's report of a three-day anger outburst and of a three-week period when he did not sleep. Schulte additionally indicated that Ledford felt much better since resuming his Zoloft medication. Still, the physician felt that, "[b]ecause of the treatments that [the plaintiff] has received in the past, it is possible that he has been more severely ill than he reveals . . . ."

A second session with Dr. Schulte took place on July 19, 2004. At that time, Schulte reaffirmed his diagnosis of major depression but noted:

> Since his last visit, the patient has been doing much better on 50 mg of Zoloft. He is happy and is not very irritable. He had one episode of explosiveness with his father regarding a cell phone[;] however[,] it was not violent and was limited to about two minutes. Otherwise he has done well. He sleeps well. . . . He appears to be either mildly mentally retarded or in the borderline intellectual functioning range.

The final medical report submitted by the plaintiff was an in-depth summary of test results and evaluation impressions offered by Kenneth Manges, a forensic psychologist. Manges's report contained his diagnosis of Ledford as suffering from a severe mental disorder, occasionally drifting into psychotic episodes, possibly schizophrenia. Manges found the plaintiff to be confused and felt that his mental and emotional condition had deteriorated since his last employment. He further offered his opinion that:

> [Ledford's] conditions meet the S[ocial] S[ecurity] A[dministration] Listing 12.08 Personality Disorder. Under section A he meets the criteria for section #3 Oddities of thought, perception and behavior. Under section B he meets criteria for #2 Marked difficulties in maintaining social functioning and #4 repeated episodes of deterioration as demonstrated by his having been fired

for sexual harassment, his having had to stop work for psychiatric hospitalization and his incarceration due to a charge of rape.

He concluded by suggesting that "remunerative employment for Mr. Ledford is outside of the scope of realistic possibility," and that the plaintiff "has a 95 percent vocational disability."

Evaluating all this evidence, the administrative law judge found that Ledford was insured for Social Security benefits through September 30, 2002, and that he suffered from severe impairments as a result of the tendinitis in his shoulder, his generalized anxiety disorder, his borderline intellectual functioning, his dysthymia, and his personality disorder. Nevertheless, the administrative law judge did not find that those impairments met or equaled any of the impairments listed in the applicable regulations "at any time on or before September 30, 2002." He further concluded that Ledford could still perform light work, including his past relevant work as an auto lot technician. Finally, because the plaintiff could perform a significant number of jobs in the national economy, the administrative law judge ruled that Timothy Ledford was not under a disability, as defined by the Social Security Act, at any time between the 2001 onset of his alleged disability and September 30, 2002. Consequently, the administrative law judge denied the request for disability benefits.

Ledford was equally unsuccessful in his appeals of that determination. The Appeals Council denied his request for administrative review and the district court likewise upheld

the administrative law judge's decision, adopting in full the report and recommendation of a magistrate judge. The plaintiff now appeals to this court.

## DISCUSSION

At the heart of Ledford's appeal is his contention that the administrative record lacks substantial evidence to support the determination that he is not entitled to Social Security disability benefits. When, as in this case, the Appeals Council denies review after an evidentiary hearing before an administrative law judge, we review the opinion of the administrative law judge as the final decision of the commissioner. *See Howard v. Barnhart*, 376 F.3d 551, 552 (6th Cir. 2004).

Judicial review of such a decision is extremely circumscribed and is limited to "determining whether the . . . findings are supported by substantial evidence and whether the [commissioner] employed the proper legal standards in reaching [the] conclusion." *Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). As noted by the United States Supreme Court, the term "substantial evidence" means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted). As a result, we do not "review the evidence *de novo*, make credibility determinations nor weigh the evidence." *Brainard*, 889 F.2d at 681. If supported by substantial evidence, the commissioner's decision must be affirmed, even though as the

reviewing court we might decide the matter differently and even though substantial evidence might also support a contrary conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc).

In analyzing Ledford's claim for disability benefits, the administrative law judge properly utilized the five-step sequential analysis detailed in 20 C.F.R. § 404.1520. Pursuant to that framework, the decision-maker first determines whether the claimant is engaged in "substantial gainful activity." If so, the individual will not be considered disabled "regardless of . . . medical condition or . . . age, education, and work experience." 20 C.F.R. §§ 404.1520(a)(4)(ii) and 404.1520(b). Second, the decision-maker considers whether the claimant has "any impairment or combination of impairments which significantly limits . . . physical or mental ability to do basic work activities." If not, the individual will not be found to have a "severe impairment" and consequently, will not be considered disabled for purposes of receiving Social Security disability payments. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii) and 404.1520(c). If, however, the impairment is "severe," and if the impairment meets the duration requirements of applicable regulations, or is equal to a listed impairment, the claimant will be considered disabled. In such a scenario, benefits will be awarded to the claimant without reference to his or her age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii) and 404.1520(d). Pursuant to the fourth step of the regulatory analysis, the decision-maker inquires into the claimant's ability to perform work that he or she has previously done. A finding of the residual functional capacity to perform past relevant work must result in a conclusion that the claimant is not

disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv) and 404.1520(f). Finally, even if a claimant is unable to perform past work, the decision-maker will still examine the claimant's residual functional capacity, age, education, and past experience to determine whether that claimant could perform *other* jobs in the economy. *See* 20 C.F.R. § 404.1520(a)(4)(v). Only if the court determines that the claimant is unable to fulfill the job requirements of any such job for which he or she is qualified will the claimant be deemed disabled for Social Security purposes. *See* 20 C.F.R. § 404.1520(g).

The administrative law judge meticulously followed this sequential analysis. Indeed, such strict adherence to the order in which the factors are to be considered is necessary because once the commissioner conclusively determines, at any point in the analysis, that a claimant either is or is not disabled, the agency need not conduct any further review of the claim. *See* 20 C.F.R. § 404.1520(a)(4).

Both Ledford and the commissioner agree that the plaintiff was not engaged in "substantial gainful activity" as of September 30, 2002, the last date on which the claimant enjoyed insured status. Thus, the administrative law judge appropriately proceeded to the second step of the analysis to determine whether the claimed impairments were severe, that is, whether they "significantly limit[ed Ledford's] physical or mental ability to do basic work activities." 20 C.F.R. § 1520(c). Although the administrative law judge concluded that Ledford's tendinitis, his generalized anxiety disorder, borderline intellectual functioning, dysthymia, and a personality disorder were "severe" in that they imposed limits on the

complexity of work the plaintiff could do and on the amount of personal interaction that was appropriate, he concluded that those limitations did not meet the listed impairments in Part 404, Subpart P, Appendix 1 of title 20 of the Code of Federal Regulations. In fact, the administrative law judge noted in his ruling that the plaintiff could perform simple, routine work, care for himself, drive, perform household chores, maintain acceptable hygiene, and interact appropriately with medical personnel while on his medications. Because the plaintiff's limitations were considered severe, however, the administrative law judge next determined whether Ledford maintained the residual functional capacity to perform his previous jobs. *See* 20 C.F.R. § 404.1520(e).

Based in part upon the testimony of the vocational expert, the administrative law judge concluded that not only could the plaintiff perform the functions of a lot technician, he could adequately fulfill the functions of other unskilled jobs in the local and national economies. It is this determination that draws into clearest focus the ultimate disagreement between the parties – whether Ledford possesses the residual functional capacity to perform any job whatsoever. On one side of the debate, psychologist Kenneth Manges testified "that remunerative employment for Mr. Ledford is outside of the scope of realistic possibility." On the other side, every other mental health professional who examined the plaintiff or the plaintiff's records concluded that, although Ledford clearly suffered from mental or emotional problems, those problems were not so severe as to preclude Ledford from any gainful employment.

Of course, the fact that a greater number of witnesses advocated a particular position is not an acceptable or accurate basis for resolution of evidentiary conflicts. Nevertheless, the consensus reached by the psychiatrists and psychologists that Ledford had only mild, or mild-to-moderate, symptoms of mental illness does supply substantial evidentiary support for the administrative law judge's determination. To counteract the weight of that testimony, the plaintiff contends that Manges's test results and summaries should be given controlling weight because Manges conducted more extensive psychological testing that also included analysis of the claimant's *emotional* state.

Two major obstacles stand in the way of Ledford's efforts to accord Manges's opinion of the plaintiff's employability sufficient weight to render insubstantial all countervailing findings. First, Manges's testing and evaluation of the plaintiff did not occur until February 2005, 29 months after the last date on which Ledford was in insured status. Consequently, the administrative law judge could reasonably conclude that the opinions rendered by psychiatrists and psychologists during the relevant time period painted a more accurate picture of Ledford's condition, abilities, and prognosis than a psychologist who had factored into his conclusions information not pertinent to the state of the plaintiff's health during the applicable time period.

Second, Manges, like his fellow psychologists, Roy Ford and Dale Seifert, assigned to Ledford scores from the Global Assessment of Functioning (GAF) Scale found in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders*

*(4th ed.) (Text Revision) (DSM-IV-TR)* (2000). Manges assigned the plaintiff a GAF score of 65, the same score assessed by Seifert in March 2002, and only five points lower than the 70 assigned by Ford in February 2002. Significantly, according to the GAF Scale, a score of 61 to 70 represents only "*[s]ome mild symptoms* (e.g., depressed mood and mild insomnia) *OR some difficulty in social, occupational, or school functioning* (e.g., few friends, conflicts with peers or co-workers)." *Id.* at 34 (emphasis in original). Clearly, such a score is inconsistent with Manges's assertion that Ledford could not realistically be expected to obtain remunerative employment in the local or national economies. Instead, the assigned GAF score is more consistent with the opinions of every other examining professional who, while recognizing the plaintiff's problems, still felt that Ledford could perform simple, unskilled, repetitive tasks in an environment that limited contact with the general public and, to the extent possible, co-workers as well.

In light of the internal inconsistencies in Manges's evaluation of the plaintiff, as well as the fact that Manges did not analyze Ledford until more than two years after the date on which the claimant was last in insured status, it was not error for the administrative law judge to decline to accord controlling weight to Manges's report. Because other substantial evidence in the administrative record supports the conclusion reached by the administrative law judge to deny Ledford disability benefits, this allegation of error is without merit.

Ledford next asserts that the administrative law judge erred in refusing to reopen the commissioner's decision to cease benefit payments to the plaintiff in February 2001. According to the plaintiff and documents that he has appended to the end of his appellate brief, Ledford was found by the Social Security Administration to be disabled as of May 11, 1995. As of the end of February 2001, however, those benefit payments ceased because Ledford failed to respond to inquiries and requests for documentation of the claimant's continuing disabled status.

For reasons that are not disclosed by the plaintiff, Ledford chose not to pursue administrative appeals of that determination. Instead, upon his release from prison, he filed a new application for benefits on January 30, 2002. At the beginning of the evidentiary hearing on that new application, plaintiff's counsel did express initial confusion about the nature of the proceeding, at which the following exchange occurred between the administrative law judge and Ledford's attorney:

> ATTORNEY: [I]t was my impression that the medical cessation was based upon Mr. Ledford's failure to respond, not upon any medical information.
>
> ADMINISTRATIVE LAW JUDGE: That I don't know. Are you – do we have all the records in, Mr. Naegel?
>
> ATTORNEY: I think we have all the records currently, Your Honor, but I think in this situation, if indeed this case is a termination case and the termination was made –
>
> ADMINISTRATIVE LAW JUDGE: It's not a termination case. It's a new application. I mean, this is not an appeal from the cessation, this is – it's a new application.
>
> ATTORNEY: I thought it was an appeal from the cessation.

- 17 -

> ADMINISTRATIVE LAW JUDGE: It is? Unless they have this all wrong. Yeah, we've got a new application here in January of '02.
>
> ATTORNEY: Okay. A new application in January of '02. Okay.
>
> ADMINISTRATIVE LAW JUDGE: January 30th of '02 and that's how it was handled. Yeah, that's what it is. It's on a new application. All right.

The plaintiff's counsel agreed, therefore, that the administrative proceeding did *not* involve a challenge to the 2001 cessation decision but, rather, was an appeal only of the denial of benefits sought in Ledford's new, January 2002 application. Because the cessation decision was thus never appealed in a timely manner through the administrative process nor challenged in this proceeding before the administrative law judge, Ledford has waived any right to contest that ruling at this time. *See* 20 C.F.R. § 404.905 ("An initial determination is binding unless you request a reconsideration within the stated time period, or we revise the initial determination.").

Ledford now claims that he should nevertheless be allowed to challenge the cessation decision at this late date because he never received adequate notice of the administrative intention to discontinue benefits. The plaintiff does concede that certain notices were mailed from the Social Security Administration advising him of the necessity to provide the agency with certain documentation. He asserts, however, that all but one of those notices were sent to his father, who served as the plaintiff's designated payee. Furthermore, he argues that, although one notice was sent directly to Ledford at an Ohio correctional facility, no evidence was adduced that he actually received the communication or that, if he did, he was able to understand it and its ramifications.

Although the commissioner does not dispute the claim that due process principles mandate adequate notice to a recipient of government benefits before their termination, he also correctly points out that the plaintiff ultimately received the equivalent of the procedural remedy he sought. Even if it could be established that Ledford did not receive the notice necessary to satisfy constitutional concerns, the appropriate remedy – and what was sought by the plaintiff – would be a reopening of the proceedings in order to establish his eligibility for continued disability payments. Although the administrative law judge refused to consider Ledford's new, January 30, 2002, application as a challenge to the cessation determination, the issue actually decided by the administrative agency was the same – whether Timothy Ledford was disabled at any time between March 1, 2001, and September 30, 2002, such that he was entitled to Social Security disability benefits. Because this litigation resolved that very issue, the plaintiff cannot establish any injury or prejudice from any alleged due process denial in the manner in which the agency sought to provide notice of the benefit-cessation decision.

Ledford insists, however, that were this court to order the reopening of the cessation decision, his evidentiary burden would be less onerous because the law presumes that a person receiving disability benefits continues to be disabled in the absence of contrary medical evidence. Not only is the plaintiff incorrect in his evidentiary premise, but he would not have been entitled to the relief he sought in any event.

First, despite the plaintiff's arguments to the contrary, the administrative record did indeed establish that Ledford's condition had improved from the time when he was first awarded disability benefits in 1995. Although such evidence was not actually transmitted to the Social Security Administration before the decision to terminate benefits, Ledford's mental and emotional conditions had stabilized by that time with use of the anti-depressant medication Zoloft. In fact, notes from prison evaluations of the plaintiff in December 2001 and January 2002 showed that "[h]e is responding to [a] combination of psychotropic medication and supportive counseling," that "[h]e doesn't appear to be at all depressed," and that "[h]e doesn't appear to be depressed or preoccupied. He is coherent and rational. He is not pressured or hypomanic as he had been previously. If anything he is a little bit subdued, although not particularly depressed."

Furthermore, the lenient burden of proof that the plaintiff seeks has no support in the governing statutes. In 42 U.S.C. § 423(f), Congress provided explicitly that any decision to terminate disability benefits under that section "shall be made on the basis of the weight of the evidence and on a neutral basis with regard to the individual's condition, *without any initial inference as to the presence or absence of disability being drawn from the fact that the individual has previously been determined to be disabled*." (Emphasis added.)

Finally, Ledford insists that the administrative law judge erred in accepting the testimony of the vocational expert concerning the availability of suitable jobs in the

economy because the descriptions for the jobs identified by the expert (car wash attendant/auto detailer, groundskeeper, flower picker, dog bather, dishwasher) did not match the plaintiff's identified skill set. Specifically, Ledford submits that he cannot perform lot technician jobs (car washer/auto detailer) because he once had an altercation with a co-worker when he previously worked in such a position. He further maintains that he is not suited to work as a groundskeeper because such a position is classified as semiskilled and he is unskilled; that he is precluded from being employed as a flower picker because such a job entails working as a member of crew; that the position of dog-bather requires reasoning and math skills well above his level of competency; and that dishwashing jobs are classified by the *Dictionary of Occupational Titles* as medium, not light, work. Put differently, he contends that the administrative law judge failed to resolve the conflict between the vocational expert's testimony and the *Dictionary of Occupational Titles*, as required in Social Security Ruling 00-4p (December 4, 2000): Titles II and XVI: Use of Vocational Expert and Vocational Specialist Evidence, and Other Reliable Occupational Information in Disability Decisions.

Despite these strident arguments on appeal challenging the vocational expert's testimony, Ledford did not bring to the attention of the administrative law judge the alleged conflict between the oral testimony and the job descriptions in the *Dictionary of Occupational Titles*. As we recently explained in the unpublished opinion in *Martin v. Commissioner of Social Security*, No. 04-4551, 2006 WL 509393, at *5 (6th Cir. Mar. 1, 2006), nothing in applicable Social Security regulations requires the administrative law

judge to conduct his or her own investigation into the testimony of a vocational expert to determine its accuracy, especially when the claimant fails to bring any conflict to the attention of the administrative law judge.

Furthermore, neither the testimony of a vocational expert nor the occupational descriptions in the *Dictionary of Occupational Titles* necessarily trumps the other. In fact, as this court stated in *Wright v. Massanari*, 321 F.3d 611, 616 (6th Cir. 2003):

> The implication of [the claimant's] argument is that the Commissioner should be bound by the Dictionary's characterization of these occupations. But this court has previously ruled to the contrary. In *Conn v. Secretary of Health & Human Services*, 51 F.3d 607, 610 (6th Cir. 1995), the court held that the [administrative law judge] and consulting vocational experts are not bound by the Dictionary in making disability determinations because the Social Security regulations do not obligate them to rely on the Dictionary's classifications.

Lastly, although the groundskeeper, flower-picker, and dog-bather jobs might indeed require skills and emotional maturity greater than those possessed by the claimant, substantial evidence in the record indicates that the plaintiff could still perform the necessary functions of the jobs of lot technician and dishwasher. Even though it is true that Ledford was fired from a previous position as a lot technician because of an altercation with a co-worker, that single incident does foreclose the possibility of similar employment in another setting with even less contact with co-workers. Also, although the vocational expert testified that the *Dictionary of Occupational Titles* classifies dishwashing jobs at both the light- and medium-exertion levels, the administrative law judge requested that the

expert limit the number of available jobs in that occupational listing to those that would not be affected by the 30-pound limitation on the weight that Ledford could lift. In doing so, the vocational expert still concluded that 627 such dishwasher jobs were available in the local economy and 97,000 available nationally. With that modification, the vocational expert was able to testify that the jobs he found available were "classified . . . consistently with how they're classified in the *Dictionary of Occupational Titles*." Consequently, any conflict between the testimony and the *Dictionary* listings was explained and resolved by the administrative law judge.

## **CONCLUSION**

For the reasons set out above, we conclude that substantial evidence in the administrative record supports the conclusion that Timothy Ledford was not disabled, for Social Security Administration purposes, during the period between March 1, 2001, and September 30, 2002, and we therefore AFFIRM the district court's judgment to that effect.